IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BREANDA TAYLOR BYNON a/k/a<br>BREANDA BYNON,<br><br>    *Plaintiff*,<br><br> v.<br><br>CRAIG MANSFIELD, *et al.*,<br><br>    *Defendants*. | CIVIL ACTION<br>NO. 15-00206 |

**PAPPERT, J.**                              **AUGUST 1, 2016**

## MEMORANDUM

  Breanda Bynon ("Bynon") sued Craig Mansfield, William McKibbin, III, Mark Weiner, Kevin Cronin, Auto Loans, LLC, Car Loans, LLC, Loan Servicing Solutions, LLC, Management Solutions, LLC (the "Title Loan Defendants"), Bryan Casey, JVI Recovery Services, Inc., Vince Venezia and Top Notch Recovery, Inc. (the "Repossession Defendants") (collectively "Defendants").[1]  Bynon alleges various violations of state and federal law related to a usurious loan that the Title Loan Defendants extended to her in 2013 and the Repossession Defendants' subsequent repossessions of her car after she stopped paying the loan.  With the exception of Mansfield, no Defendant has entered an appearance or responded to either her complaint or amended complaint.

  Before the Court are Bynon's motions to withdraw her second amended complaint and to reinstate her first amended complaint, and for default judgment against all remaining Defendants.  For the reasons that follow, the Court grants her motions.

---

[1] Mansfield filed a motion to dismiss the amended complaint, contending that tribal sovereign immunity immunizes him from Bynon's lawsuit.  (ECF No. 16.)  On May 21, 2015 the Court granted his motion.  (ECF No. 21.)

1

**I.**

In March 2013, Bynon borrowed $2,500 from Sovereign.[2] (Pl.'s Am. Compl. ¶¶ 24, ECF No. 2.) She submitted her loan application online at a website that Sovereign operated called "Title Loan America." (*Id.* ¶¶ 23, 25, Ex. P-6.) Bynon does not recall seeing or accepting any particular terms or conditions at the time she took the loan. (*Id.* ¶ 26.)

Between March and June 2013, Bynon repaid Sovereign approximately $1,326 in three installments. (*Id.* ¶ 28.) On June 28, 2013 she applied for and received a second loan from Sovereign for an additional $2,435.91. (*Id.* ¶ 29.) At that point, Sovereign calculated that Bynon had an outstanding balance of $4,950, which included the unpaid principal and interest on the initial loan and the principal of the second loan. (*Id.*) Bynon does not recall accepting any terms or conditions associated with the second loan. (*Id.* ¶ 30.)

Between July 2013 and May 2014, Bynon made twelve payments to Sovereign totaling approximately $9,298. (*Id.*, Ex. P-2.) In June 2014, Sovereign demanded a final payment for the outstanding balance on the loan (the "Balloon Payment"), which Bynon denied she owed and refused to pay. (*Id.* ¶ 35.) In July 2014, Sovereign retained Bryan Casey, a tow truck operator and owner of Top Notch Recovery, Inc. ("Top Notch"), to repossess Bynon's pick-up truck as collateral for the Balloon Payment. (*Id.* ¶ 36.) After Top Notch repossessed the truck, Sovereign demanded $3,192.08 from Bynon to "reinstate the loan," which she paid on August 6, 2014. (*Id.* ¶ 40, Ex. P-2.) Sovereign allowed Bynon to recover the truck but continued to demand that she pay the Balloon Payment. (*Id.* ¶ 41.)

---

[2]   Bynon has not named Sovereign as a Defendant "because it is protected from liability under the doctrine of tribal immunity." (Pl.'s Am. Compl. ¶ 13.) *See Goldenstein v. Repossessors, Inc.*, 815 F.3d 142, 144 (3d Cir. 2016) ("As a consumer lending company wholly owned by the Lac Vieux Desert Band of Lake Superior Chippewa Indians and incorporated under Chippewa tribal law, Sovereign was authorized to issue loans secured by vehicles at interest rates far greater than permitted under Pennsylvania law.").

Bynon refused to make any further payments to Sovereign and it again repossessed the truck in September 2014 through JVI Recovery Service, Inc., owned by Vince Venezia. (*Id.* ¶¶ 41–44.) Sovereign demanded $1,500 to recover the truck and a final payment of $4,892 due on October 6, 2014 to satisfy the loan. (*Id.* ¶ 45, Ex. P-5.) Bynon paid the $1,500 and recovered the truck but refused to pay the $4,892 that Sovereign demanded. (*Id.*, Ex. P-5.)

Bynon requested a copy of her loan agreement which was sent to her on November 21, 2014. (*Id.*, Ex. P-3.) The loan agreement, titled the "Pawn Ticket and Agreement" (the "Loan Agreement") states that the loan carries a 182.02-percent interest rate with a payment schedule of eleven payments of $747.05 each month with one final payment of $5,797.05. (*Id.*) The Loan Agreement identifies Bynon's car, a 2008 Ford pick-up truck, as the "Pawned Motor Vehicle" which she "agree[s] to pledge and pawn to [Sovereign] . . . in exchange for the agreed [p]rincipal [a]mount." (*Id.*) Although Bynon's electronic signature appears on the last page of the Loan Agreement,[3] she alleges that she never saw or agreed to its terms. (*Id.* ¶ 31.) Specifically, she testified that she "never signed or agreed to th[e] pawn ticket and agreement" and that "there was never any part of [the agreement she saw] which obligated [her] to any type of balloon payment." (Hr'g Tr. 49:18–20, ECF No. 52.)

On January 8, 2015, after Bynon continued to refuse to make any further payment to Sovereign to satisfy the purported outstanding balance, Sovereign had her truck repossessed a third time. (*Id.* ¶ 46.) Mark Weiner, a representative from Sovereign, demanded that Bynon pay $5,000 to recover the vehicle. (*Id.* ¶ 47.) He told her that she had ten days to pay and refused to tell her where the vehicle was located. (*Id.*)

---

[3] The Loan Agreement states: "By typing your last name and verifying your date of birth below, you are electronically signing and agreeing to all the terms of this Pawn Ticket Agreement." (Pl.'s Am. Compl., Ex. P-3.) Below that paragraph is Plaintiff's last name and her date of birth. (*Id.*)

3

## II.

Bynon filed the complaint against Defendants on January 16, 2015 and her amended complaint on January 21, 2015.  (ECF Nos. 1, 2.)  She subsequently filed affidavits stating that she had served each Defendant with the amended complaint and summons.  (ECF Nos. 3–5, 12, 17, 25, 31, 33.)  In her amended complaint, Bynon alleges: (1) violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*, against the Repossession Defendants (Pl.'s Am. Compl. ¶¶ 60–63); (2) violation of Pennsylvania's Loan Interest and Protection Law ("LIPL"), 41 Pa. Cons. Stat. §§ 502, 504 against the Title Loan Defendants (*Id.* ¶¶ 64–71); (3) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) against all Defendants (*Id.* ¶¶ 72–100); and (4) conversion and trespass to chattel against all Defendants (*Id.* ¶¶ 101–106.)

On March 6, 2015 Bynon filed a second amended complaint despite not have been granted leave to do so pursuant to Federal Rule of Civil Procedure 15(a)(2).  (ECF No. 13.)  Bynon also did not properly serve the second amended complaint upon the Defendants pursuant to Rule 4.

In June 2015, Bynon requested pursuant to Rule 55(a) that the clerk of court enter default against each Defendant for failing to answer or otherwise defend after being served with the amended complaint.  (ECF Nos. 23, 24, 26, 27, 28, 30, 32.)  After the clerk of court entered default, Bynon filed a motion for default judgment against the Defendants on October 16, 2015. (Pl.'s Mot. for Def. J. ("Pl.'s Mot."), ECF No. 46.)  In that motion, Bynon contends that "the facts averred in the second amended complaint establish liability under" the FDCPA, LIPL and RICO.  (*Id.* at 4.)  She filed a supplemental memorandum on March 23, 2016 bringing to the Court's attention the Third Circuit Court of Appeals' recent decision in *Goldenstein v.*

*Repossessors, Inc.*, 815 F.3d 142 (3d Cir. 2016).  (Pl.'s Suppl. Mem. at 1, ECF No. 49.)  Bynon argues that *Goldenstein* provides further support for her RICO claim against Defendants.  (*Id.*)

On April 29, 2016 Bynon filed a motion to withdraw her second amended complaint, reinstate her amended complaint and amend her initial motion for default judgment after realizing that her initial request "is defective because the [second amended] complaint . . . was not served under [Rule 4]."  (Pl.'s Mem. in Supp. of Mot. to Amend Mot. for Default J. ("Pl.'s Mot. to Amend) at *1, ECF No. 50.)  She states that default judgment should instead be entered as to the amended complaint because it was served pursuant to Rule 4 and the clerk entered default as to that pleading.  (*Id.* at 2.)  Consequently, she asks that the Court: (1) withdraw her second amended complaint; (2) reinstate her amended complaint; and (3) grant default judgment on the amended complaint.  (*Id.*)  Defendants have not answered or otherwise responded to any of Bynon's complaints and have not responded to her motion for default judgment.

The Court held a hearing on June 23, 2016, during which Bynon testified and presented evidence regarding the nature and extent of her damages.  (ECF No. 52.)

**III.**

Bynon seeks to withdraw her second amended complaint and to reinstate her first amended complaint, which she properly served upon each Defendant pursuant to Rule 4.  (Pl.'s Mot. to Amend at *1.)  She states that "[w]hatever prejudice or disadvantage the defendants experienced by not being served under [R]ule 4 with plaintiff's Second Amended Complaint will be remediated by allowing the complaint to be withdrawn and reinstating the Amended Complaint."  (*Id.* at 1–2.)  District courts in this Circuit have permitted a plaintiff to withdraw a second amended complaint and proceed based on a properly served amended complaint.  *See Gardner v. Achebe*, No. 04-cv-618, 2006 WL 469654, at *2 (D.N.J. Feb. 27, 2006).  Further,

5

"[a]n amended complaint only super[s]edes an original complaint once it is served." *E. Wind Indus., Inc. v. United States*, No. 97-cv-2615, 2003 WL 21153263, at *2 (D.N.J. Mar. 27, 2003), *rev'd in part on other grounds*, 108 F. App'x 723 (3d Cir. 2004) (citation omitted). Since Bynon properly served all Defendants with her first amended complaint, and since Defendants will not be prejudiced, the Court grants Bynon's motion to withdraw her second amended complaint and reinstate her first amended complaint. (ECF Nos. 3–5, 12, 17, 25, 31, 33)

## IV.

Bynon also seeks default judgment under Rule 55 based on the allegations in her first amended complaint and Defendants' failure to respond. (Pl.'s Mot. at 4; Pl.'s Mot. to Amend at *1–3.) "A consequence of the entry of a default judgment is that the factual allegations of the complaint, except those relating to the amount of damages, will be taken as true."[4] *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990) (citations and internal quotation marks omitted). The court need not, however, accept the moving party's legal conclusions or allegations relating to the amount of damages. *Id.*; *see also DirecTV, Inc. v. Asher*, No. 03-cv-1969, 2006 WL 680533, at *1 (D.N.J. Mar. 14, 2006) (citing 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kaneet, *Federal Practice and Procedure* § 2688, at 58–59, 63 (3d ed. 1998)). Consequently, before granting a default judgment the Court must first ascertain whether "the unchallenged facts constitute a legitimate cause of action, since a party in default does not admit mere conclusions of law." *Asher*, 2006 WL 680533, at *1 (citing Wright, § 2688, at 63).

---

[4] "[W]hen entry of a default judgment is sought against a party who has failed to plead or otherwise defend, the district court has an affirmative duty to look into its jurisdiction both over the subject matter and the parties." *D'Onofrio v. Il Mattino*, 430 F. Supp. 2d 431, 437 (E.D. Pa. 2006) (citations and internal quotation marks omitted). Bynon has alleged sufficient facts to demonstrate Defendants "purposefully directed [their] activities at the forum" and that those activities serve as the basis of this lawsuit. *Marten v. Godwin*, 499 F.3d 290, 296 (3d Cir. 2007) (citing *Burger King Corp.*, 471 U.S. at 472) (internal quotation marks omitted). Bynon has accordingly alleged sufficient facts to demonstrate that the Court has personal jurisdiction over Defendants. The Court also has subject-matter of Bynon's lawsuit pursuant to 28 U.S.C. § 1331.

### A.

The Loan Interest and Protection Law ("LIPL") establishes lawful interest rates in Pennsylvania and remedies for violations of those rates. 41 Pa. Cons. Stat. § 101 *et seq.* "The purpose of the law is to protect citizens 'from being exploited at the hands of unscrupulous individuals seeking to circumvent the law at the expense of unsuspecting borrowers who may have no other avenue to secure financial backing . . . .'" *Glover v. Udren*, No. 08-cv-990, 2011 WL 1485707, at *7 (W.D. Pa. Mar. 14, 2011) (quoting *Smith v. Mitchell*, 616 A.2d 17, 20 (Pa. Super. Ct. 1992)). Section 201(a) establishes a maximum lawful interest rate of 6 percent per annum for loans of $50,000 or less. 41 Pa. Cons. Stat. § 201(a). Section 504 permits an individual to sue for damages resulting from violations of the LIPL. 41 Pa. Cons. Stat. § 504. "Even when the interest rate is usurious, however, the LIPL does not void the entire loan or the legal interest, nor does it make it illegal for a lender to collect an unpaid debt." *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 147 (3d Cir. 2016) (citations omitted). The Third Circuit has stated that "[i]nstead, the LIPL only makes voidable 'the interest specified beyond the lawful rate.'" *Id.* (citations omitted).

Defendants charged Bynon an interest rate of 182.02 percent, well above the legal limit established by the LIPL. The principal that Bynon borrowed is below the statutory cap of $50,000 and the loan does not otherwise fall into any of the statutory exceptions. 41 Pa. Cons. Stat. § 201(b). Further, Bynon satisfied her obligation on the loan when calculating interest at the maximum allowable rate of 6 percent per annum. She made payments on the loan every month until May 28, 2014, at which point she had paid $10,623.93. (Pl.'s Aff., Ex. P-2.) She subsequently paid Sovereign $3,192.08 and $1,500 to recover her truck after it had been repossessed on two separate occasions. (*Id.*) She has accordingly alleged sufficient facts to

demonstrate that the interest on the loan is usurious under Pennsylvania law and has properly alleged a claim for violation of the LIPL against McKibbin, III, Weiner, Cronin, Auto Loans, LLC, Car Loans, LLC, Loan Servicing Solutions, LLC and Management Solutions, LLC.

**B.**

To prevail on a claim under the Fair Debt Collection Practices Act ("FDCPA"), a plaintiff must establish that a "debt collector['s]" effort to collect a "debt" from a "consumer" violated some provision of the Act. *Piper v. Portnoff Law Assocs., Ltd.*, 396 F.3d 227, 234 (3d Cir. 2005). The FDCPA provides that "[a] debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. The statute further provides that a debt collector violates § 1692f when it "tak[es] . . . any nonjudicial action to effect dispossession or disablement of property if . . . there is no present right to possession of the property claimed as collateral through an enforceable security interest." 15 U.S.C. § 1692f(6). The FDCPA is a strict liability statute. 15 U.S.C. § 1692k(a).

In cases where one party has procured another party's assent by fraud in the factum, "courts treat the agreement as void and legally ineffective." *Giannone v. Ayne Institute, et al.*, 290 F. Supp. 2d 553, 561 (E.D. Pa. 2003) (quoting *Resolution Trust Corp. v. Koock,* 867 F. Supp. 284, 287 (E.D. Pa. 1994)). Fraud in the factum occurs when "fraud . . . procures a party's signature to an instrument without knowledge of its true nature or contents." *FDIC v. Deglau*, 207 F.3d 153, 171 (3d Cir. 2000) (quoting *Langley v. FDIC*, 484 U.S. 86, 93 (1987)); *see also* Restatement (Second) of Contracts § 163 & cmt. a (1981) (defining fraud in the factum as "a misrepresentation as to the character or essential terms of a proposed contract").

Here, Bynon did not agree to the terms of the Loan Agreement and the Repossession Defendants accordingly had no right to possession through an enforceable security interest.

Further, even if the loan was valid, Bynon had satisfied—and indeed exceeded—her obligations on the loan when calculating her payments at Pennsylvania's limit of 6 percent interest per annum.

Bynon also alleges that Casey and Venezia, as owners of Top Notch and JVI, respectively, are liable for violations of the FDCPA. The Third Circuit Court of Appeals has stated that "the general partner of a 'debt collector' limited partnership may be held vicariously liable for the partnership's conduct under the FDCPA." *Pollice v. Nat'l Tax Funding, L.P.*, 225 F.3d 379, 405 (3d Cir. 2000). Bynon has accordingly presented enough facts to state a claim against Top Notch, Casey, JVI and Venezia for violations of the FDCPA.

### C.

Bynon alleges that Defendants McKibbin, Cronin, Weiner, Casey and Venezia violated RICO by repossessing her car to collect her unlawful debt. (Pl.'s Am. Compl. ¶ 72.) Section 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). The statute defines "[u]nlawful debt" as, among other things, debt "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and [ ] which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

Bynon has alleged sufficient facts to state a RICO violation against the individuals responsible for extending the usurious loan, McKibbin, Cronin and Weiner, as well as the

individuals responsible for repossessing her truck, Casey and Venezia. McKibbin, Cronin and Weiner were principals who formed, directed and supervised the business entities through which they operated their alleged scheme—specifically, Car Loans, LLC, Auto Loans, LLC, Sovereign Lending Solutions, LLC and Loan Service Solutions, LLC. Those individuals created the lending entities for the purpose of making and collecting usurious loans, and they conspired with Casey and Venezia to collect the unlawful debt through their repossession companies.

In *Collins v. Siani's Salvage, LLC*, No. 13-cv-3044, 2014 WL 1244057, at *4–6 (E.D. Pa. Mar. 26, 2014), the court dismissed plaintiff's RICO claim against a repossession agency because "[r]epossession of collateral by a towing company does not give rise to a claim under RICO for collection of an unlawful debt." *Id.* at *5. Critical to the court's holding was its distinction between "the collection of unlawful debt"—which RICO prohibits—and "the collection of collateral for that debt," which the court stated RICO did not prohibit. *Id.* The court in *Goldenstein v. Repossessors*, 13-cv-02797, 2014 WL 3535112, at *8 (E.D. Pa. July 17, 2014) relied on that reasoning to reach the same conclusion. On appeal, the Third Circuit reversed, holding that the distinction between debt collection and collection of collateral securing a debt is a "distinction without a difference." *Goldenstein*, 815 F.3d at 149. It held that RICO is applicable to seizures of collateral securing an unlawful debt. *Id.* at 149.

Bynon has thus sufficiently pleaded that: (1) Defendants are persons under the definition of the statute (Am. Comp. ¶ 73); (2) each entity constitutes an enterprise (*Id.* ¶¶ 74–76); (3) Defendants are employed or associated with an enterprise (*Id.* ¶¶ 77–82); (4) the enterprises are engaged in interstate commerce (*Id.* ¶ 83–88); and (5) Defendants conducted the affairs of the enterprises or participated in the affairs of the enterprises through the collection of unlawful debt.

(*Id.* ¶¶ 89–96). She has also alleged sufficient facts to establish that Defendants conspired to violate Section 1962(c), in violation of Section 1962(d). (*Id.* ¶¶ 97–98.)

**D.**

An individual commits the tort of trespass to chattels by intentionally dispossessing another person of a chattel or intermeddling with a chattel in another person's possession. *See Pestco, Inc. v. Associated Products, Inc.*, 880 A.2d 700, 708 (Pa. Super. Ct. 2005). That trespass may culminate in a conversion if the interference with the owner's right of possession is sufficiently severe to permanently deprive him or her of that right. *See Baram v. Farugia*, 606 F.2d 42, 43–44 (3d Cir. 1979). A conversion may occur even if the defendant does not appropriate the property for his own use. *See Central Transport, LLC v. Atlas Towing, Inc.*, 884 F. Supp. 2d 207, 218–19 (E.D. Pa. 2012).

Bynon has alleged sufficient facts to demonstrate that the Repossession Defendants unlawfully repossessed her vehicle and "committed trespass to chattel by depriving [her] of temporary possession of her vehicle without a just cause or excuse." (Pl.'s Am. Compl. ¶ 102.) She has also alleged sufficient facts to demonstrate that the damage to her truck after the unlawful repossessions was permanent, specifically testifying that the truck was "damaged and wouldn't start." (Hr'g Tr. 30:11–12.) Bynon has accordingly presented sufficient evidence to state a claim for conversion.

**V.**

Given that "the unchallenged facts constitute [ ] legitimate cause[s] of action," the Court must now consider whether entering default judgment is appropriate. *Asher*, 2006 WL 680533, at *1 (citation omitted)). "Three factors control whether a default judgment should be granted: (1) prejudice to the plaintiff if default is denied, (2) whether the defendant appears to have a

11

litigable defense, and (3) whether defendant's delay is due to culpable conduct." *Chamberlain v. Giampapa*, 210 F.3d 154, 164 (3d Cir. 2000) (citing *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 195 (3d Cir. 1984)).

Each of these factors weighs in favor of granting default judgment. Bynon will be prejudiced if the Court denies her motion because she has "no other means of vindicating [her] claim[s] against" Defendants. *Asher*, 2006 WL 680533, *2 (granting default judgment where defendant "has not responded in any fashion," "has not asserted any meritorious defense" and has not "offered any excusable reason for his default"). Further, "the court may presume that an absent defendant who has failed to answer has no meritorious defense, because [i]t is not the court's responsibility to research the law and construct the parties' arguments for them." *Joe Hand Promotions, Inc. v. Yakubets*, 3 F. Supp. 3d 261, 271–72 (E.D. Pa. 2014) (internal citations and quotation marks omitted). Finally, Defendants' failure to "engage[ ] in the litigation process" constitutes "culpable conduct with respect to the entry of a default judgment—indeed, for the Court to conclude otherwise would be to reward the recalcitrant or the oppositional and uncooperative."[5] *E. Elec. Corp. of N.J. v. Shoemaker Constr. Co.*, 657 F. Supp. 2d 545, 554 (E.D. Pa. 2009).

---

[5] Bynon's counsel submitted evidence to the Court to demonstrate the nationwide reach of Mansfield, Cronin, Weiner and McKibbin's scheme and their attempts to "hide themselves as much as possible," including incorporating the Title Loan companies in the Cook Islands. (Hr'g Tr. 9:11–13.) For example, Bynon's counsel submitted a Declaration from Dale Geiger, an investigator assigned to the Financial Fraud/Consumer Protection Section of the Oregon Department of Justice. (Ex. P-18 ("Geiger Decl.").) In that Declaration, Geiger stated that he conducted an investigation of Auto Loans, LLC and Car Loan, LLC pursuant to a civil complaint filed by the Oregon Attorney General. (*Id.* ¶ 3.) After describing situations similar to Bynon's involving a number of Oregon residents, Geiger articulated the methods that Auto Loans, LLC and Car Loan, LLC have used to conceal their principals' identities, including the use of "virtual office space." (*Id.* ¶ 20.) He stated that he "attempted several times to contact Defendant, [but] . . . [e]ach time [he] called, after identifying [him]self the recipient either hung up or stated nobody was available to take [his] call." (*Id.* ¶ 39.)

**VI.**

After granting the motion for default judgment, the Court must address the amount of damages to award. *See Rios v. Marv Loves 1*, No. 13-1619, 2015 WL 5161314, at *13 (E.D. Pa. Sept. 2, 2015). The Court may conduct a hearing to determine the amount of damages owed to the plaintiff, FED. R. CIV. P. 55(b)(2), or "may rely upon detailed affidavits submitted by the parties." *J & J Sports Prods., Inc. v. Puentenueva*, No. 14-3226, 2014 WL 7330477, at *2 n.1 (E.D. Pa. Dec. 22, 2014) (citation omitted). Here, the Court relied on Bynon's affidavit and also vetted it with Bynon, who testified at the hearing conducted by the Court.

Bynon has submitted the following evidence in support of her actual damages:

$10,630.49 — interest overpayment (Bynon Decl. ¶ 5–6)
$455.17 — fuel pump repair after repossession (*Id.* ¶ 11)
$2,975 — transmission repair after repossession (*Id.* ¶ 12)
$2,135 — lost income[6] (*Id.* ¶ 15)
($2,500) — money received from Defendants[7]
$13,695.66 — total actual damages

Bynon requests that the Court enter judgment in her favor for treble her actual damages, based on the remedies provided to her under RICO.[8] (Pl.'s Mot. at 15.) Under Section 1964(c) of the statute, Bynon may recover treble damages if she has successfully sustained: "(1) a [S]ection 1962 violation and (2) an injury to business or property by reason of such violation."

---

[6] Under questioning at the hearing, Bynon satisfied the Court that the repossession of her truck caused her to miss three-and-a-half weeks of work. (Hr'g Tr. 38:15–43:19.)

[7] After filing this lawsuit, the Title Loan Defendants contacted Bynon and asked her to sign a "General Release" purporting to withdraw all claims against them in exchange for $2,500. (Hr'g Tr. 5:23–6:8.) Although she signed the release and received the $2,500, her counsel contends that plaintiffs cannot release claims for usury under Pennsylvania state law. (Hr'g Tr. 51:6–52:14; Pl.'s Mot. at 6 (citing *Thompson v. Prettyman*, 79 A.2d 874, 876 (Pa. 1911).) The existence of the release is not alleged in the amended complaint, it was not submitted during the damages hearing and its validity is not before the Court on Bynon's motion. Bynon does concede, however, that she received $2,500 from certain Defendants and that amount should be deducted from her total actual damages. (Hr'g Tr. 30:14–25.)

[8] In her motion, Bynon included estimates for auto repair in her actual damages calculation, including $500 for "body work, cleaning" and $197.24 for "valence replacement." (Pl.'s Mot. at 15.) Bynon stated during the damages hearing, however, that those figures were only estimates and not actual expenses. (Hr'g Tr. 34:2–12.) The Court accordingly does not include those estimates in her actual damages calculation.

*Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1143, 1187 (3d Cir. 1993) (citation omitted). "The plain language of section 1964(c) does not permit a court or jury any option in the event of a verdict against the defendant but 'requires' an award of treble damages." *Genty v. Resolution Trust Corp.*, 937 F.2d 899, 912 (3d Cir. 1991) (internal citation omitted). Since she has adequately alleged sufficient facts and provided the Court with evidence to demonstrate a Section 1962 violation, the Court will enter judgment in her favor and against Defendants in the amount of $41,086.98.

## VII.

Bynon's counsel also requests attorney's fees and costs, which he is entitled to under the FDCPA, LIPL and RICO. (Pl.'s Mot. at 16); 15 U.S.C. § 1692k(a)(3); 41 Pa. Cons. Stat. § 503; 18 U.S.C. § 1964(c). The Court has discretion to "determine what constitutes a reasonable fee in accordance with the substantial Supreme Court precedent pertaining to the calculation of reasonable attorney's fees." *Graziano v. Harrison*, 950 F.2d 107, 114 (3d Cir. 1991). When using its "wide discretion" to determine whether fees are reasonable, the Court's inquiry "should not result in a second major litigation." *Fox v. Vice*, 536 U.S. 826, 837 (2011) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). The Court must, however, "'go line, by line, by line' through the billing records supporting the fee request." *Evans v. Port Auth. of New York & New Jersey*, 273 F.3d 346, 362 (3d Cir. 2001) (citations omitted).

Bynon's counsel submitted to the Court his invoices and detailed time records. (Pl.'s Mot., Ex. P-15.) Counsel bills his time at $275 per hour in five minute increments. (*Id.*) His legal fees and costs total $11,462, and he excluded any time spent responding to Mansfield's motion to dismiss since Bynon did not prevail on that motion. (*Id.* at 15.)

Counsel's hourly rate of $275 is reasonable.  He has practiced law for 27 years and his hourly rate is lower than the rates charged by other attorneys with comparable experience according to the Community Legal Services, Inc.'s rate survey.  *See Maldonado v. Houstoun*, 256 F.3d 181, 187–88 (3d Cir. 2011) ("The fee schedule established by Community Legal Services, Inc . . . has been approvingly cited by the Third Circuit as being well developed and has been found by [the Eastern District of Pennsylvania] to be a fair reflection of the prevailing market rates in Philadelphia.") (citations and internal quotation marks omitted).  After reviewing counsel's invoices, the Court determines that the amount of time that counsel has spent on the matter is reasonable in light of the nature of the suit and work he has performed.  *See Fox*, 536 U.S. at 838 (stating that "trial courts may take into account their overall sense of a suit, and may use estimates in calculating and allocating an attorney's time").

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.